Case No. 13-3038 and 14-3064, Page Plus of Atlanta Inc v. Owl Wireless LLC Argument not to proceed. 15 minutes per side. Mr. Stephen Dorday, 2 minutes. Or you may proceed for the appellant. Yes, Your Honor. I am Stephen Dorday for the appellant and I'm observing 2 minutes of my time for rebuttal. You may please proceed. Thank you, Your Honor. Simply put, this court must decide if it was error for the trial court to grant a sua sponte summary judgment to the appellee, Owl, on the defense that Owl had no standing to assert, and when there had not even been a motion for summary judgment, Owl then was not even motion pending. That is what the trial court did here. Procedure will posture the case as somewhat unusual, though it wasn't unusual for a while. And this is a fairly straightforward breach of contract case. I mean, you folks filed cross motions in limine, which went directly and specifically to the question whether an assignment had happened. Correct? They did. And we filed one as well. That's correct. And the court considered those, and this is what the appellant did. And in those motions, you brought forth all your evidence. No, that's not correct. No, why not? It wasn't necessary. I just needed to show I had evidence. It was a motion limiting me. The issue on a motion limiting is not what evidence do you have. I think perhaps the parties mislabeled their motions. I mean, they really seem like summary judgment motions in terms of the issue. It's kind of an odd. It was an odd. The fact of the matter was their motion was limiting. And what happened is, in the courtroom, the appellee would like you to think that we were on notice that this issue was just boiling and boiling and boiling. And that's not what happened. Let's assume that you're right about that. And let's assume that perhaps motion eliminating correctly, designated or not, was not the right vehicle in which to address this question. You did file a motion for reconsideration. And it seemed to me in reading this, you had the opportunity at that point to explain to the judge, one, you were surprised you didn't understand this. Two, here is your evidence on this connection on the question of the assignment. And we did present evidence at that point. And there was certainly enough to get past summary judgment. And the judge, I would say, is a little concerned. Let me stop you right there. Okay. So having said, yes, we filed our motion for reconsideration, yes, we filed evidence, and you think it was a sufficient bond, doesn't that really take the question of how this got to us off the table? No. Why not? On Friday, before the program on the post, I was told we were having a status comment to discuss what was going to happen at trial. The judge came on and said, I'm going to decide the issue on the assignment. I bet that's a surprise to everyone. I want you to assume in my question that everything the judge did was wrong and was in your favor, was against your interest up to the time, up through the time that he made his initial ruling. Let's assume that that's all wrong. You then filed a motion for reconsideration. What I'm asking you is why didn't that solve the problem? First of all, the judge denied it just out of hand. He didn't even issue an opinion. He just stamped something on there saying deny. That's not true. That's not true? Sure. It's a margin entry. That's it. Very few courts enter, and it says, based upon the reasons set forth in Owell's response. He incorporated everything that Owell said. Now, whether we like the district judges to do that might be a different question, but that's what it actually says. I still don't think it's adequate measure. Friday, he says, surprise, I'm going to rule on this. Monday, he issues his ruling. I rush around and get evidence together in a motion for reconsideration in three days. That's not what the federal rules of procedure afford me. Okay, so you got some evidence in. Right. And now how long has it been since that happened to today? Years. Months. So it's a long time. So we're looking at this stuff, and we're trying to figure out, all right, even if he got surprised, even if this was unusual, what is your evidence of the assignment? So we'll get to that. But in the meantime, for your opening, you already said, and, by the way, they didn't have standing. Correct. They didn't raise the question. The district judge sui sponte raised the question. So, now, granted, it was the House, but why should we be focusing on whether they did or did not have standing on something clearly the district judge had the right to be concerned about? You can't bring a claim if you're not a party to the contract. That's elementary. And, therefore, the court did not have jurisdiction over that claim. It was not before the court. Article III jurisdiction is no Article III. I assure you. You got the wrong claim. You're making the claim. You're suing on the basis of a contract. Correct. And if SNAP is not a party to that contract, there's no case. Right. The district judge clearly has the authority to and the duty to inquire into that, does he not? I guess he has the right to inquire into that, but it wasn't an issue before. Time out. I don't care if it was an issue before. You conceded he had a duty to inquire into that. Obviously, without that, there is no case. He inquires into it. Why is standing even – you guys spent – both of you spent all kinds of times talking about standing. I don't understand why we care about standing on something that you conceded was his duty to look at, and he did. What? You just don't like the outcome. Conceded is a duty. I mean, he looked at it. I don't know if it was his duty to look at it, but, I mean, he did look at it, and he got it wrong. Because he said, as far as I understood – and this is another problem with this, to respond to it correctly – he never said what evidence he was looking for. During the course of the call, I thought he was just asking for evidence of consideration, which is not required for an assignment. You can have an assignment that's a gift and makes it merely irrevocable. You're getting the drift, probably. Or you should be. You're not – it's unlikely you're getting anywhere on standing. At least I'm having trouble figuring out why the procedure that admittedly was odd ended up being that big a deal, given the reconsideration. So if we cut to the chase, we look at all the evidence that you say indicates the contract was assigned to SNAP, and at least just from one judge's standpoint, there doesn't seem to be any evidence of that. So what's the evidence? Evidence of one party said we assigned it, the other party said we didn't. Everybody performed as if the contract had been assigned. They knew they were dealing with a new company. They continued to deal under the contract with the new company, just as they dealt with the old company. You know, interestingly enough, while there's lots of argument that it was assigned, where do you point to somebody even saying that it was formally and technically assigned? There's an affidavit from the accountant in the record. Which witness was that? Forrest Dahl. I don't believe his name. Who had no independent knowledge. No, he was there. There when? When they did it. Well, that's – okay, but I think Judge McKee is highlighting the fact that at least the record doesn't seem to give us any indication of when this assignment actually happened. I mean, this is not, like, so extraordinary. It added that people have questions about the existence of this assignment. I mean, normally we have a piece of paper. We don't here. Normally we don't have a year's litigation by one party, and then that party says, actually, we're the wrong ones to be here, and we assigned our rights to someone else. I mean, there are some good reasons to be skeptical here, and I think we want to give you a chance. Where in the record, specifically, is your best evidence that the assignment happened? Probably in the evidence we submitted with the motion for reconsideration. There the accountant said that the parties changed their corporate structure, and it occurred in or about January of the year following the execution of the contract. Because the accountant – that's when the notice was sent to Al for the new company, I believe it was January 9th. The W-9 was sent to them saying there was a new company involved. They went forward with that. The accountant – that's when the company was changed. They decided to restructure. The problem, from my standpoint, and the reason for this is a few years ago, is I have clients that are salesmen. They're not sophisticated businessmen. They're not legal eagles. You know, they probably – they know that they were performing the SNAP under the contract. How it got there, you know, legally speaking, is it an assignment, was it a name change? They're not sophisticated. And that obviously came out, and that's what happened in this situation. We finally got it right. We know who the parties are, and there's an interrogatory answer where we prevented that. We know that the assignment was paid for by the SNAP. I think that's a pretty fair summary of probably what happened between these two guys, so we appreciate your candor on that. If you wanted to focus us on the reconsideration in answer to Judge Keflach's question, that's where you present these ten so-called bullet points as to why it was an assignment. Now, reading those, nine of those don't go to the assignment at all. They simply go to the question of was there acquiescence by our. So the only one that I can find of the ten that even deals with the question of was it actually assigned is this affidavit of Forestall, the CBA, which you alluded to earlier. The district judge then simply dismissed in his ruling that declaration as insufficient to create a triable fact upon the validity of the alleged assignment. So if I'm right in parsing those ten things that you say are your best evidence and only one deals with the assignment, then it seems to me we focus in on what was the district judge right or wrong in discounting the affidavit of the accountant. He was wrong. It just seems really odd. If you've got all of these people and the only one that even speaks to the assignment is CBA. How about the parties? Well, the parties are talking about name changes and the problem is their lack of sophistication in terms of their testimony. In terms of the legal effect, the accountant is the one that did it, and he knew. And once again, if I had noticed that that was the issue we needed, then the affidavit would have been in earlier. That creates a question of fact. By the time of the reconsideration, you fully were aware of that. Right, and we submitted it. But you said you submitted the affidavit, but you weren't aware of the issue that the affidavit was supposed to address. No, I'm sorry. If I said that, I misspoke. I meant that if I had known that the judge was going to bring this issue up to respond, it would have been affidavit in there before he made his initial decision. I was not saying that the affidavit was… What's the page ID number of the affidavit? I'm sorry, I don't know. You know what that is in terms? Page ID of the affidavit? I don't, but I can look. Okay. Go ahead. Anyway, with regard to the evidence, the evidence of how the parties acted certainly is evidence of their oversight. They knew we operated as if the contract was signed. They operated as if the contract was signed. That certainly is evidence. They saw it. According to them, it was just a name change. Well, that's not credible. They sent us a new W-9. They identified an absolutely new contract. How can you say that that's not credible when your very own parties say, we added SNAP because we, page plus, were the ones on the contract? We added SNAP, and then they did a restructuring because one part of it went out of the country, so SNAP became the party to the contract because it's different. I didn't phrase that very well. Somewhere in there, here, I read that even in the pleadings, somebody explains that page plus is the one that filed the complaint because they were the one on the contract. They were the only one on the contract. Once again, that's my client making legal interpretations. Well, I mean, yeah, in the context of litigation where presumably they had counsel. And, I mean, under oath, a verified complaint, they're saying what you said is just totally incredible. I.e., it's a name change. That it wasn't a different entity. They just changed their name. I mean, why is that incredible when your own people said it under oath? Because she wouldn't have used W-9 for that. She knew, and then they dealt with all the correspondence with SNAP, Inc. They knew the corporation's name, that the corporation was a different corporation. I don't remember. Your red light is on. But I don't remember reading about a W-9 and its significance. So, in just a couple sentences, a minute or two at the most, can you explain what that is for me and what the significance you derive from that? Sure. The W-9 form was sent by OWL to SNAP so that OWL could then supply product to SNAP, OWL could pay SNAP, and so on and so on. And what is it? Under the contract. What is the W-9? The tax form that they have to file. The W-9, I'm sorry, they're going to have to file the IRS. They got a call saying, you know, SNAP's doing business with you. She said, look, you need a W-9 from the new company. They knew they were dealing with a new company. Where does the word, she said, we were dealing with a new company, where does that come from? I'm not sure that she admitted that, but there was no reason for a W-9. If you don't, or are not dealing with a new company, if you're dealing with the same company, you're dealing with the same company. Who asked for the W-9? SNAP? SNAP. Oh, no. OWL. OWL. OWL's director of, I think, an account. They're a number two financial person. They have a CFO, and then the person sort of does the bookkeeping and the bills and so forth. She dealt with our person in a similar position at SNAP, and said, I need you to send me, or I need you to fill out this W-9 since it's a new company. Well, if the W-9 has the wrong name on it, even if it's the same entity, that would seem to be a reason to get a new one, wouldn't it? In other words, that would be consistent with just simply a name change, you know? I mean, the form we have has our old name. If there was no name change, then I guess SNAP and AgriState Plus could be certified. No, I'm talking, there's a difference just between a name change and an assignment. And as I understand your opponent's argument, they're saying they thought this was simply a name change, and that they were dealing with the same entity under a different name, in which case it would seem quite conceivable that the new, the renamed same entity would need an updated W-9 with a new name. I don't believe, I believe there's at least estimates of conduct on that, so it would be appropriate. Maybe when you stand back up, you can tell us where to look for the, both the page ID on the affidavit and the record pages on the deal with this W-9 question. If you're not, I don't think you have that information with me, so I'll be happy to provide it myself. If you don't, if you don't, when you stand back up, just say it again. Okay. Thank you. May it please the Court, good morning. My name is Matthew Harper at the law firm of Eastman & Smith. I'm here this morning on behalf of the Appleton-New Brossetown Wireless. Judge McKee. Can you finish up on W-9 right now while we're, while it's fresh in our minds? You were going to talk about that first anyway, right? I will. I was, I will, and here we go. But I did want to address the affidavit of the, I also want to address the affidavit of the CPA. That is in the appendix at pages 36 to 37. And let me address... We don't, that isn't something we use. We can access all this stuff on these fancy... It was Exhibit 12. We need a page ID. That's what you're supposed to cite to. Well, the cite I have... It's the consecutive page ID number, which is the way we find it. I believe the reason this is in the appendix is because it was filed under seal. Ah. So, I can, I will tell you the cite that I have, it's R-127, motion for reconsideration, Exhibit 12, appendix at 36 to 37. With regard, let me address the affidavit of the CPA and this W-9 issue directly since there was so much discussion about it. The CPA was a witness that was never disclosed at any time during the preceding two years of litigation in this. So, we submitted to the district court when that affidavit appeared from this witness for the first time on a motion for reconsideration that, wait a minute, that's inappropriate. This person has never been listed in initial disclosures, discovery responses, testimony. We had specifically... That's interesting, but it's not what the district judge relied on, right? To the extent that he relied on our brief, that was part of our brief. You pointed out that he adopted our arguments in denying the motion for reconsideration. That was part of the ruling. The other point on the affidavit is when you read the affidavit, it offers no facts of when, how, who, or anything else with regard to the assignment. It simply has a single conclusory paragraph that says there was an assignment. Mr. Doherty says that this guy was there and when it happened. Is there, ignoring whether that's true or not, is there record evidence?  There's no evidence from the testimony of either the principals of SNAP and prepaid, Mr. Listis and Mr. Harris, or based on this single paragraph in the conclusory affidavit that establishes any specific conversation, when this assignment took place, the words used, or how. So there's no way to know from the record that this CPA witnessed a conversation, heard a conversation. There's nothing in this affidavit that says I heard Mr. Listis say to Mr. Harris, we're going to assign, or even if they didn't use the word assignment, we're going to transfer the contract or we're going to give the contract to SNAP. There's just nothing like that in this record. And on this issue, so that's on the CPA, those are the points with regard to the CPA. With regard to this issue with W&I, that whole issue refers to an exchange of about three emails over the course of about, as I recollect from the record, about 45 minutes of time between PPA and SNAP's bookkeeper and Al's bookkeeper, where PPA and SNAP's bookkeeper was submitting an order for something. Our bookkeeper said, well, it's this SNAP, I guess I need a W&I for that. Okay, here's a W&I. That was the end of it. There was no discussion about an assignment, and neither of these people involved in this email exchange were principals of the company or officers of the company. Are there words new company appearing anywhere in the discussion of the W&I? Only if the, and I don't have the email in front of me, but I believe that one of the emails said, well, we're going to use this new name or this new entity, something to that effect, we'll need a W&I. But that's the end of it, and it's never a discussion between any of the parties that had any knowledge of the specific terms of these contracts. Neither of those parties to those email exchanges had any involvement in the negotiation of the contract, the workings of the contract. They were making sure that the clerical things that needed to happen just for the exchange of paper and money happened. So to say that that is, that that, just that, that one little exchange, aha, that proves that, A, there was an assignment. It doesn't. There's no evidence contained in those that says anything about an assignment or when it happened or et cetera. Nor can that be, aha, well, now I know all about it. And I, one of the fundamental problems that we've had throughout the case with this claim of an assignment, you know, recalling that it came up at the end of the first year of litigation when we had deposed the principals and all of a sudden there was an epiphany that, well, gee, there must have been an assignment because now we have, we realize now that it was staffers doing all this, not PPA. We challenged the evidence at that point. We proceeded to depose their people and challenge them. The problem we had was that there was never anything that would meet the essential elements for an assignment, which Ohio law has proved to be wrong in this. If you allege an assignment, which they clearly allege an assignment, in paragraph 16 of their complaint in the 2011 litigation, they said PPA assigned its rights and responsibilities to staff. So to prove that, they have to show that there was an assignment or a transfer of property for valuable consideration. The Ohio Supreme Court has so held. And they have to prove that assignment meets the elements itself of a contract, mutual assent, definite necessity to terms, consideration. And they never had evidence that they could take off and say, well, here are those elements are. What they kept doing was trying to point to things that Al did or communications that Al received and say, well, see, that proves there was an assignment. You know, it's almost like, well, we can't prove it. You should have figured it out. Go ahead. I was waiting for you to end the world's longest run on 5-7. You know, this is a common plural argument. You can't see the semicolons periods are common. Excuse me. I'm sorry. Let's assume, I'm using a new legal term here, that H-plus and SNAP were pretty loosey-goosey in their dealings with each other. It seems to be a fair statement that Al's dealings with SNAP were equally loosey-goosey as far as who they were dealing with and why. So what I think is odd here is H-plus and SNAP allude to an equitable estoppel argument, but they really don't develop. You would just ignore it like it doesn't even exist. And then when H-plus files their reply, they don't jump on the fact that you didn't even respond and drive home the point about equitable estoppel. So that's where we seem to be now in the pleas. So I'm trying to figure out, it does seem odd to me, that even if there was lack of record evidence in the assignment, you clearly dealt with whatever SNAP is or whoever they are, and there seemed to be a mutually beneficial arrangement between the two. So tell me, please, why the district court shouldn't have enforced what is said to have been the understanding of the contract in terms of the agreement between Al and SNAP? Your Honor, I think fundamentally, and I certainly don't intend to ignore that, the argument that they made below was not that. I don't think that they argued, well, there's some estoppel. I think at one point they did try to argue waiver early on, which we addressed, the district court rejected, which I think related closely to their standing argument, which the district court also rejected. But I am unaware of any basis to say that, well, we can excuse the assignor and assignee's legal responsibilities to effect an assignment. Isn't that exactly what estoppel, an equitable principle, effectively does? It could, but I'm not aware of any law that would apply that principle where there was, A, there was a lack of evidence of any assignment to begin with, and there's a lack of any evidence where they said, hey, by the way, we're assigning this contract. If they had sent a letter from their president to our president that said, just want to let you know, PPA is assigning its contract rights to SNAP, then I think that point might have some validity, but there's nothing like that here. I think your argument would be a pretty good argument. If you had been dealing with Page Plus all this time, and SNAP came along later and tried to enforce a Page Plus contract, I get that. But you dealt with SNAP, whoever or whatever it was, to the tune of millions and millions of dollars, correct? And you were happy as a clam doing that, until ultimately you get sued on this Most Favored Nation issue. We dealt with... Is there anything I just said that's wrong? Well, let me say this, your Honor. In the course of dealing between PPA and SNAP, this idea that PPA was here and SNAP was here, as two separate, wholly separate entities, that was never clearly communicated. Frankly, I don't think it was even unclearly communicated to the principals of our wireless who would have had to receive that notice. So we didn't... How wireless was not able to define that, oh, we're dealing with a new entity, a new company. What we knew is that they were using this name of SNAP to pay. They had told us... You had a contract with someone. Correct. That contract had what we call a Most Favored Nation clause in it, right? You're arguing about what it meant. Section 7 had a pricing component, that's correct. You kept dealing with somebody under the terms of that contract, but you allegedly did not have that partner. Is that right? I understand that. Now you're saying, well, we reaped all the benefits of continuing to have them sell our wireless timer, or whatever this deal was, but we're not bothered by that term because it turns out there wasn't any assignment. It just doesn't smell. I disagree, your Honor, with all due respect. I mean, again, and it's to address in a brief. I don't know that I'll have time to get into it on an oral argument. We disagree with the District Court's decision on Section 7, but we acted as we thought Section 7 required in dealing with PPA. PPA's principals had told us in the negotiation of the contract that they might use a new name. That was the last that our principals heard about it, and then when we just started seeing e-mails where they used both names, they would have page plus slash SNAP. They have no idea what that is, and here's the problem I have with all this, your Honor. The focus on this analysis, with all due respect, to determine whether SNAP prepaid at an assignment that gave it standing to bring a contract claim against our rested on an assignment that they have to prove and that they are in complete control of. Our has nothing to do with that. We have nothing to do with whether an assignment occurs. We have nothing to do with marshaling their evidence of what that assignment is. We simply are on the other side of this, and until somebody tells us, hey, by the way, there's an assignment and we can prove it, we have every right to challenge that they're the proper party. And they said in their final remaining claim for breach of contract, they made that claim on behalf of SNAP and SNAP alone. We challenged that, and as your Honor put forth in the earlier question, certainly the party that's being sued has the right, and the district court had the right to look into the evidence and say, wait a minute, you're bringing a contract claim. Do you have a right under that contract? And this estoppel, I think, turns out to be... I don't want to spend all of your time on this, but I want you to understand that at least what I'm hearing you say is, yes, Judge, you asked me about equitable estoppel, but I'm not going to answer your question about equitable estoppel because I have a right to argue they didn't have a valid assignment. You're just repeating what you said in the briefs, or didn't say, which, frankly, I was asking you to explicate upon, and if you don't like it, that's fine. Your Honor, I didn't mean to evade your question, and I certainly don't want to end up with a recession. We don't think equitable estoppel applies here, period. We don't think it was argued below. We don't think there's evidence of a basis to find that Al is somehow equitably estopped from challenging the fact that SNAP didn't have an assignment, and therefore did not have standing to bring a contract. We do not believe that's an appropriate argument. We don't believe that's the argument that PPA made below, and we also don't think that there's evidence of equitable assignment because of the lack of clear, unequivocal notice to us that says, yes, there was an assignment. Does that answer your question more squarely? I apologize if I was dancing. I didn't mean to. Yes, it does. Thank you. I see my red light is on. Unless the Court has other questions for me, I will stand down. I thank you for your time this morning. Thank you. May it please the Court. I don't have the record of sites because they were in the appendix. I don't think it would have worked anyway because I used their fancy equipment, and I went to 127, and it tells me sealed document, which is not a good thing. But we have that site, and we can easily chase it. I do want to point out a couple of things. We're in the brief, and I just want to point out some crazy stuff. I'll acknowledge that by contract, SNAP prepaid as head of this case. They acknowledge SNAP had the contract. Where is this? This is in the appendix. Page 2223, October 8, 2009, email, I believe. That is consistent with them thinking that SNAP is another name. Well, except then, and you can focus on this. The emails are talking about the email that Owl acknowledged that the invoice would be. We need to fill out a W-9 so that Owl's invoices would be in going to the new company, not your new name company, but the new company. So a jury could find that one entity assigned rights to another based upon the bookkeeper's email, not aware of the bookkeeper's email referring to the new company? Everybody. Yes, I think that's correct. Do you think that gave a genuine issue of material fact? I do, and when you go further and you look at all the other subsequent emails that are listed in our appendix, she said it was a new company, and they started saying, SNAP has the contract. SNAP needs to get preferred pricing. You have preferred pricing. You are the master distributor. Who is they? They being Owl. Owl's personnel, Owl's executives, Owl's salespeople said, you are people that are here. You're no longer a master distributor. You're this. You are bound by the contract. They have to get the most. They even acknowledge in an email that SNAP was to get the preferred pricing that they've briefed. And I also would like to point out very briefly that, obviously, I don't think we did brief the argument on equitable estoppel that we should have. You make a good point, and that's sort of the problem. Let me follow that up by what really Mr. Harper should have emphasized, if it's true. While you alluded to the things that could be made into an equitable estoppel argument, i.e., what they did, in the court below, as I read it, all of those things that you said were in aid of a course of conduct argument, and you never presented an equitable estoppel argument under that theory to the district court. Am I right about that? I never presented any argument on summary judgment to the district court because the district court didn't give me an argument to do so. You didn't hear me use the word summary judgment, did you? I'm sorry? At no point did you argue equitable estoppel below. I don't believe so. All right. So then why would we not be there in saying that that argument, which you're now raising here, is weighted? It's never been presented to the district court. You can say that. All right. I don't have to concede that that would be appropriate. Okay. Thank you. All right. Interesting case. The case will be submitted. We will look at the sealed documents. As Judge Kessler said, the fact that we have fancy equipment doesn't allow us to access it on the bench. It doesn't mean we don't have it in the back of the office, of course. The case will be submitted. Thank you for your capability to argue with us. Thank you. Thank you. All right.